UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| SHAYNE & KEITH LUNDY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-06-69 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

The above-captioned civil action arises out of Plaintiffs Shayne Lundy ("Shayne") and Keith Lundy's ("Keith") (collectively, the "Lundy's") contentions that United States Border Patrol ("USBP") agents wrongfully arrested and detained them in violation of their civil rights. The Court presided over a one-day non-jury trial on July 30, 2008. After carefully considering the pleadings, the evidence, the pre- and post-trial briefing of the parties, the responses thereto, the entire record, and the applicable law, the Court hereby makes the following findings of fact and conclusions of law. To the extent that any conclusion of law is more properly characterized as a finding of fact, and/or vice versa, the Court hereby adopts it as such.

### Findings of Fact

1. On November 18, 2004, Shayne—a lieutenant in the United States Army who has spent time as a military policeman—returned from service in Iraq to visit his brother, Keith in Laredo, Texas. The brothers, both of whom are United States citizens, had not seen one another in approximately three years.

2. Keith, himself a former member of the United States Army, was at all relevant times an employee of the USBP in Laredo. Keith now works as a USBP instructor in Artesia, New

Mexico, where he teaches courses in immigration and constitutional law.

3. On the evening of November 19, 2004, Keith and Shayne, along with Keith's wife, ventured to Graham's Central Station ("Graham's"), a dance club which is divided into several rooms, each of which features different dance floors, entertainment stages, and/or bars.

4. Both Lundy's testified that they arrived at Graham's at approximately 9:00 p.m. With similar consistency, the brothers stated that as the evening unfolded, they drank, danced, and generally celebrated Shayne's return.

5. The celebration began as Keith opened a bar tab at the first of the two bars at which the Lundy's purchased drinks. After enjoying a few drinks, the number of which is unclear to the Court, Keith closed his bar tab and the brothers moved on to another bar within Graham's.

6. Keith opened a bar tab at the second bar and the brothers continued to order and enjoy drinks. Although their subsequent behavior greatly belies their testimony, Keith and Shayne claimed to have limited their consumption to only three to five beers.

7. When Keith attempted to close the second bar tab, he noticed what he believed to be an additional, unnecessary twenty dollar charge. After briefly discussing the matter with the bartender, Keith asked if he could speak with a manager.

8. A Graham's manager arrived to discuss the issue and escorted the brothers to the club's front lobby to speak out of range of the loud music emanating from one of Graham's dance floors. The bartender followed the party. Once the group was in the quieter front lobby, the manager and the Lundy's began discussing the purported excess charge.

9. Ultimately, the manager was unsympathetic to the brothers' plight and did not remove the

amount. The bartender, who was standing behind the club manager and facing the Lundy's, smiled at the two brothers. Shayne, obviously not pleased with the bartender's smirk, pointed towards the bartender and exclaimed, "You're dead motherf\*\*\*er."

10.   The manager then grabbed Shayne's arm and, according to the Lundy's, attempted to take Shayne to the ground. Shayne then struck the manager twice in the face.

11.   At trial, the Lundy's attributed Shayne's aggressive behavior to his being diagnosed with post-traumatic stress disorder resulting from his service in Iraq. Although the Court is both thankful for his service and regretful of his condition, it finds it clear that at least some of Shayne's hostile and violent behavior was a result of the brothers' alcohol consumption, which the Court surmises was well-above the level they reported.

12.   Several private security guards then converged at the scene and tackled the Lundy's. After a brief scuffle during which the brothers sustained minor injuries, the two were handcuffed and escorted outside.

13.   The Laredo Police Department was notified of the skirmish and Officer Jaime Palomo ("Officer Palomo") was dispatched to Graham's. At some point during the time in which the Lundy's were handcuffed, either Graham's security personnel or Officer Palomo took possession of their identification cards, which included Keith's driver's license and Shayne's military identification (collectively, "the ID's").

14.   Although Officer Palomo never administered a sobriety test or attempted to obtain a blood alcohol measurement, he credibly described the Lundy's as appearing intoxicated. Officer Palomo testified that the brothers exhibited bloodshot eyes, had breath which smelled of alcohol, and engaged in behavior and speech patterns indicative of those under the influence.

15.     Officer Palomo spoke with the Lundy's and they initially informed him they were visiting

        from out of town and had no family in Laredo. However, a cursory inspection of Keith's

        driver's license revealed that he (at least at one time) lived in Laredo, and Keith eventually

        informed Officer Palomo that he was a USBP agent in Laredo. Keith then asked Officer

        Palomo if, out of professional courtesy, he could remove Keith's wife from the situation.

        Officer Palomo complied with Keith's request.

16.     Officer Palomo also discussed the underlying incident with the Graham's manager. Upon

        learning that Keith was a USBP agent, the manager declined to press charges and insisted

        merely that the brothers be removed from the premises. Accordingly, the manager issued the

        Lundy's informal criminal trespassing notices (Gov't. Exs. 9 & 10), Officer Palomo issued

        a verbal warning to the same effect, and the brothers were uncuffed.

17.     Officer Palomo, in what he characterized as an effort to do the Lundy's a favor, called the

        USBP dispatch to pick up the brothers. Accordingly, USBP Agents James Herrick ("Agent

        Herrick")—a supervisor for the USBP Laredo North Station—and Vicente Jimenez ("Agent

        Jimenez") were dispatched to Graham's.

18.     Once at the scene, Agent Herrick spoke with the club manager and Officer Palomo, who

        handed Agent Herrick the brothers' ID's. Agent Herrick testified that he believed the two

        appeared drunk, an observation he confirmed via discussion with the manager and Officer

        Palomo. Neither Agent Herrick nor Agent Jimenez recognized or otherwise knew either

        Lundy brother.

19.     Agent Herrick then told the Lundy's to "get in the [USBP vehicle]." The Lundy's complied

        and entered the vehicle's back seat. Officer Palomo and Agent Herrick testified that the

Lundy's appeared to consent to this means of removal and transportation, estimations which are corroborated by the fact that neither Agent Herrick nor Agent Jimenez informed the Lundy's they were under arrest, touched the brothers, or otherwise physically escorted them into the vehicle. Keith then asked Agent Herrick where he and his brother were being taken, and Agent Herrick replied, "off the property."

20.   Keith testified that he voluntarily consented to being taken off the property in the USBP vehicle.

21.   Shayne stated in an affidavit (Gov't. Ex. 1) that he "agreed" to enter the vehicle, but at trial testified that he merely "complied" with Agent Herrick's request. Through his trial testimony, during most of which he was quarrelsome and argumentative, Shayne attempted to characterize his agreement and/or compliance with Agent Herrick's request as something less than voluntary consent. Shayne's trial testimony also appears to contradict assertions presented in Plaintiffs' Motion for Summary Judgment (Dkt. No. 16), wherein the Lundy's stated that "[t]o be sure, Plaintiffs do not deny that they agreed to be taken off the premises [in the USBP vehicle]." Despite his combative assertions to the contrary, the Court finds that Shayne, like his brother, voluntarily consented to entering the vehicle to be taken off the property.

22.   Once in the vehicle, the rear doors of which automatically lock from the inside, Agent Herrick began talking to the Lundy's and learned that Keith worked at the USBP Laredo South Station.  Keith then inquired a second time as to where he and his brother were being taken. Agent Herrick informed them they would be taken to the USBP Laredo South Station "to be dealt with" and that a serious incident report ("SIR") would likely be generated.

23.    Keith testified that he perceived this response to be threatening.

24.    As the vehicle was pulling out of the Graham's parking lot, Keith spotted his wife and asked

       if Agent Herrick would pull over so that he could speak with her. Agent Herrick complied,

       pulled over, and rolled down Keith's window. Keith briefly spoke with his wife and the

       parties resumed their drive to the USBP Laredo South Station. Neither brother asked or

       otherwise indicated they wanted to be released to Keith's wife at that time.

25.    During the drive, the Lundy's discussed between themselves the potential SIR and Keith

       began to protest Agents Herrick and Jimenez's authority to transport them to the USBP

       Laredo South Station. Keith repeatedly stated to the Agents that he believed they were acting

       outside the scope of their authority and asked for his and his brother's ID's back. Shayne at

       no time requested his ID, but rather sat quietly in the back seat. Agent Herrick described

       Keith's behavior as increasingly "belligerent" and stated that he simply believed there to be

       a "problem in the backseat." Keith admitted that he was "amped up" and was exhibiting

       "amplified emotions," behavior the Court attributes to the alcohol consumed during the

       evening as well as the above-described altercation.

26.    Although the Lundy's consented to getting in the vehicle and being taken off the property,

       the Lundy's testified that they did not consent to being taken to the USBP Laredo South

       Station. In lieu of being taken to the USBP South Station, the Lundy's claim they would

       rather have been dropped off at a Church's Chicken adjacent to Graham's.

27.    The Lundy's, however, at no time made this suggestion to either Agent Herrick or Jimenez.

       Indeed, although Keith lodged several general complaints, neither brother at any time

       explicitly asked to be released from the vehicle or indicated they would prefer another

location at which they could be safely released.

28.    The Lundy's testified that, despite the fact Agent Herrick had—upon request—pulled over and allowed Keith to talk with his wife, they thought such requests were not options. Conversely, Agent Herrick—when asked whether he would have dropped the Lundy's off at Keith's home if asked—stated that he may have done so if asked.

29.    Moreover, it appears clear that to the extent Keith complained about being taken to the USBP Laredo South Station, such complaints were voiced only *after* Keith concluded an SIR might be generated. In other words, Keith did not contest the aid of his fellow USBP agents until he discerned he may actually be reprimanded for his and his brother's earlier indiscretions.

30.    Approximately fifteen to thirty minutes after they left Graham's, the Lundy's arrived at the USBP Laredo South Station. They exited the USBP vehicle and were taken through the station's sally port entrance and into a processing area. The Lundy's complained that during this portion of their transportation, they were placed in plain view of both detainees and several of Keith's fellow USBP agents. The Lundy's remained in the processing area for several minutes before being moved to a conference room. The Lundy's waited in the conference room along with USBP Agent Juan Acosta ("Agent Acosta") for approximately fifteen minutes. Agent Acosta reported that he did not believe the brothers to be under arrest or detention.

31.    Agent Herrick left the Lundy's to discuss the situation with Field Operation Supervisor Scott Sais ("FOS Sais"). FOS Sais asked Agent Herrick for the Lundy's ID's, made copies of the documents, returned the originals to the brothers, and gathered some information to generate

an SIR. FOS Sais testified that he believed the Lundy's to be free to leave at any time.

32.     FOS Sais also testified that an SIR would have been generated whether or not the Lundy's where brought to the USBP Laredo South Station that evening because the SIR was produced to address the bar fight and not the transportation from Graham's to the station. When asked whether he believed this to be true, Keith responded that he too believed an SIR would likely have been generated whether or not the brothers where taken to the station.

33.     While in the conference room, Keith made two phone calls to his wife. During the first call Keith informed her that he and his brother were ok, and during the second call he asked her to come to the station to pick them up. Shortly thereafter, Keith's wife arrived at the station and took the Lundy's home.

34.     As a result of the above-described events, an SIR was generated, Keith was disciplined for conduct unbecoming an officer, and he ultimately served a one-day suspension. Keith testified that following these events he suffered stress at home with his wife and has had difficulty explaining his disciplinary report to other federal law enforcement agencies to which he has applied for employment. Shayne presented no evidence that he suffered any adverse consequence as a result of the alleged unlawful arrest and detention.

### Conclusions of Law

1.     The Lundy's filed suit against the Government pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et. seq.*, on the underlying common law claims of false arrest and imprisonment. Under the FTCA, the law of the state where the act or omission occurred govern the actions' substantive claims. 28 U.S.C. § 1346(b); *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008); *Tovar v. United States*, C.A. No. 3:98-CV-1682, 2000 WL

425170, at \*5-6 (N.D. Tex. Apr. 18, 2000) (citing *Caban v. United States*, 728 F.2d 68, 72
(2d Cir. 1984)).

2.      Pursuant to Texas law, a false arrest is tantamount to effecting a false imprisonment, *Whirl
v. Kern*, 407 F.2d 781, 790 (5th Cir. 1968), and Texas courts understand the elements of the
two to be identical. *Bertuca v. Martinez*, No. 04-04-00926-CV, 2006 WL 397904, at \*5
(Tex. App.—San Antonio Feb. 22, 2006, no pet.) (citing *Wal-Mart Stores, Inc. v. Rodriguez*,
92 S.W.3d 502, 506 (Tex. 2002)). To establish either claim under Texas law, a plaintiff must
show that a defendant carried out (1) a willful detention, (2) without consent of the detainee
and (3) without authority of the law. *Id.*; *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d
640, 644-65 (Tex. 1995) (citing *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375
(Tex. 1985)).

3.      A wilful detention can be enacted by violence, threats, or any other means that would
restrain an individual from moving from one place to another. *Martinez v. Goodyear Tire
& Rubber Co.*, 651 S.W.2d 18, 20 (Tex. App.—San Antonio 1983, no writ). However, if a
plaintiff voluntarily complies with a request to be confined to a certain area, no claim for
false arrest or imprisonment exists. *Id.*

4.      Although a plaintiff need not necessarily actively resist detention, the means by which a
plaintiff asserts he was restrained must actually result in the detention, and not mere
intimidation of the person. *See Rice Food Mkts., Inc. v. Ramirez*, 59 S.W.2d 726, 738 (Tex.
App.—Amarillo 2001, no pet.); *see also Broadnax v. Kroger Tex., L.P.*, No. 05-04-01306-
CV, 2005 WL 2031783 (Tex. App.—Dallas Aug. 24, 2005, no pet.). Accordingly, a
plaintiff's failure to attempt to leave or request that he be permitted to leave a place of

detention may be taken into consideration when determining whether the plaintiff consented

to his confinement. *See Cuellar v. Walgreens Co.*, No. 13-00-594-CV, 2002 WL 471317, at

*2-4 (Tex. App.—Corpus Christi Mar. 28, 2002, no pet.) (finding that a plaintiff consented

to confinement "by never attempting to leave [the detention facility]");  *Fojtik v. Charter*

*Med. Corp.*, 985 S.W.2d 625, 631 (Tex. App.—Corpus Christi 1999, pet. denied) (holding

that a plaintiff consented to his detention because although he complained about his

internment, "he never insisted that he be permitted to leave").

5.      The question of whether a plaintiff was detained without consent is one of fact to be decided

by a factfinder. *See, e.g.*, *Ramirez*, 59 S.W.2d at 738.  In order to make out a claim of false

arrest or imprisonment under the FTCA, a plaintiff need not demonstrate that he suffered

actual damages, as nominal damages are available. *See Landry v. A-Able Bonding, Inc*., 75

F.3d 200, 207 (5th Cir. 1996) (citing *Whirl v. Kern*, 407 F.2d 781, 798 (5th Cir. 1969); *see*

*also Brown v. United States*, 486 F.2d 284, 289 (8th Cir. 1973) (reversing in part a district

court judgment and noting that the lower court may be charged with the task of "comput[ing]

what damages, nominal or actual,[] plaintiff is entitled to receive" because punitive damages

are not available under the FTCA).

6.      Where, as here, a plaintiff contends he was detained by threat, the charging party must

establish that the threat would inspire in him a "'just fear' of injury" above and beyond a

mere subjective belief he was subject to unwelcome constraint. *Fojtik*, 985 S.W.2d at 631

(quoting *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 645 (Tex. 1995)); *Cuellar*,

2002 WL 471317 at *2.  When determining whether such threats are sufficient to overcome

a plaintiff's free will, courts take into account factors such as the "relative size, age,

experience, sex, and physical demeanor of the participants." *Id.*

7.     The Court concludes that the circumstances in this case are not sufficiently oppressive, nor were the Lundy's sufficiently vulnerable, to effectuate the brothers' false arrest or imprisonment. Both Lundy's are fully grown, physically capable, military-trained men, with more than ample education and experience as to law enforcement to be expected to articulate a clear demand that Agents Herrick and Jimenez should have released them from the vehicle. Agents Herrick and Jimenez, moreover, at no time told the Lundy's they were under arrest, handcuffed the brothers, or otherwise made physical or verbal threats toward the brothers that the Court construes as sufficient to overcome their free will.

8.     At any time, the Lundy's could have asked for their release or suggested an alternative location to which they could have been taken. Any claim that they felt such a request was not a viable option is severely undercut by the fact that Agent Herrick had previously complied with Keith's request to speak with his wife, the two were not handcuffed, and the two consented to enter the USBP vehicle. The brothers' testimony to such an effect is further belied by their wholly self-serving and often contradictory and combative testimony, which the Court refuses to lend great weight.

9.     As in *Fojtik* and *Cueller*, nothing in this case suggests that the Lundy's were persons "whose weakness or susceptibility to intimidation might excuse [their] failure to insist on leaving" when they believed they were falsely arrested and imprisoned. *Fojtik*, 985 S.W.2d at 631 (holding that the free will of a forty-five-year-old man who had run several businesses and was not physically restrained, but who was threatened with the police, had not been overcome); *Cuellar*, 2002 WL 471317 at *3-4 (holding that the free will of a college-

educated woman who was never physically restrained but was the subject of a "rude," "abrupt," and "short," but "calm" interrogation, had not been overcome). Indeed, the evidence indicates the contrary: the Lundy's were well aware of their ability to control and manipulate the situation, as illustrated by Keith using his USBP credentials to extract his wife from the situation at Graham's and Agent Herrick's compliance with Keith's request that he speak to his wife. Although it is clear that Keith generally bemoaned Agents Herrick and Jimenez's actions, Keith's drunken complaints solely relating to the return of the brothers' ID's and Agents Herrick and Jimenez's authority—or lack thereof—do not comprise a sufficient attempt at resisting his confinement to grant the Lundy's the relief they request.

10.     In support of their claim, the Lundy's largely rely upon *Rice Food Mkts., Inc. v. Ramirez* for the proposition that Texas law does not require a plaintiff to resist detention to show lack of consent. 59 S.W.2d 726 (Tex. App.—Amarillo 2001, no pet.). In *Ramirez*, the plaintiff—who store employees suspected of stealing a beverage—voluntarily followed a detective to the back of a grocery store only to then be handcuffed to an office chair and left alone before later being turned over to the police. *Id*. at 729. On the basis of these events, a jury found that the plaintiff was falsely imprisoned. *Id.* at 738.

11.     However, the *Ramirez* court merely upheld the jury's verdict, stating that the above-described circumstances were "some evidence that she was detained without her consent" and that the jury's finding that the plaintiff was detained without consent was "not so against the great weight and preponderance of evidence that it is manifestly erroneous or unjust." *Id.* Given the generous standard employed when reviewing jury findings, at most, the

*Ramirez* case can be read to support the proposition that, although a plaintiff need not

*necessarily* actively resist detention to establish a claim of false arrest and imprisonment, the

manner in which a plaintiff claims to have been confined must *actually result in* the

unwanted detention. Although the Court acknowledges that the circumstances present here

do not leave the Lundy's completely without a colorable argument, as set forth above, the

great weight of the evidence supports a finding that the brothers consented to their brief

detention.

12.     Unlike the plaintiff in *Ramirez*, at no time were the Lundy's actually physically restrained

by representative of the United States. To the extent the automatically locking doors could

be considered a physical restraint, they were not made so by any affirmative act of Agents

Herrick or Jimenez. The Lundy's were aware that such an automatic locking mechanism was

in place, voluntarily placed themselves in the vehicle, and at no time attempted to actually

attain their release from the situation.

13.     Because the Court concludes that no false arrest or imprisonment occurred, it need not

address the Government's arguments concerning proportionate responsibility. However, the

Court notes that even if it were to conclude that a false arrest and imprisonment took place

—and that the Government was *entirely* at fault—the damages awarded would merely be

nominal. The Lundy's involvement with agents of the USBP lasted for approximately one

hour, during which neither brother sustained physical harm. Any stress that Keith may have

suffered at home with his wife is more likely due to his conduct at the night club than the

actions of the USBP. Moreover, assuming *arguendo* the Lundy's were falsely arrested or

imprisoned, this would not result in the invalidation or diminishment of Keith's disorderly

conduct charge as all the relevant USBP witnesses, Keith included, surmised that the charge would have been brought whether or not the Lundy's were taken to the USBP Laredo South Station that evening.

14.     That this dispute was litigated in federal court is both perplexing and regrettable. It was certainly not worth the trouble and time it took to litigate. At its core, this case presented a pair of brothers who did not want to take responsibility for their role in a drunken bar brawl, but rather blame fellow law enforcement officers who extracted them from the troubling situation in which they had become entangled. As the Court of Appeals for the Seventh Circuit aptly observed in a case similarly lacking in merit:

> It is unfortunate that this petty [] dispute found its way into federal court, invoking the machinery of a justice system that is admired around the world. The suit was not so wholly without basis in fact or law as to be frivolous, but neither was it worth the inordinate effort it has taken to adjudicate it . . . We take this opportunity to remind the bar that sound and responsible legal representation includes counseling as well as advocacy. The wiser course would have been to counsel the plaintiffs against filing such a trivial lawsuit. . . . Lawsuits like this one cast the legal profession in a bad light and contribute to the impression that Americans are an overlawyered and excessively litigious people.

*Purtell v. Mason*, 527 F.3d 615, 627 (8th Cir. 2008).

### Conclusion

For the reasons set forth above, Plaintiffs' requests for relief are hereby **DENIED**. Judgment shall be rendered against Plaintiffs' and in favor of the Government.

It is so **ORDERED**.

**SIGNED** this 12th day of January, 2009.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

14